OPINION
{¶ 1} This appeal arises from the Lake County Court of Common Pleas, wherein appellant, James E. Pesci, was convicted of three counts of burglary in a jury trial.
 {¶ 2} On September 26, 1998, Thomas Clarke ("Clarke") arrived home from a daylong trip to Sea World with his friend, Mike Puthoff and Puthoff's family. Clarke resided on Tamarin Court in the Wayside Lakes Development in Mentor, Ohio. Clarke and the Puthoffs left for the day at 11:00 a.m. and returned at approximately 10:30 p.m. Puthoff drove the group in his minivan with Clarke sitting in the front passenger seat.
 {¶ 3} When they arrived at Clarke's residence, which was illuminated by two lights near the garage door, Clarke stepped out of the van and noted a man running from the front door of his home, through bushes and around the side of the home, leaving the front door open. Clarke immediately took chase.
 {¶ 4} As he was chasing the man, he noted a white object in the man's hand. At one point, Clarke heard an object fall on the cement, followed by the sound of coins hitting the pavement. Clarke continued to chase the man and, as he got closer, he removed his camera from his pocket and threw it at the suspect, hitting him in the back. At this point the two were in the front yard of a home directly behind Clarke's street. The area was lit by a streetlight, several lights on the front of the house, as well as lights from the neighboring home. After being struck by the camera, the suspect turned around and faced Clarke. Clarke testified that he looked at the suspect "right square in his face." Clarke then became nervous and concerned that the suspect may have had a weapon, so he backed off and the suspect took off running.
 {¶ 5} Clarke returned home and phoned the police. The call came into the Mentor Police Department at 10:39 p.m. The police arrived at the scene a few minutes later and got a description of the suspect from Clarke. Clarke described the man as being approximately five feet, ten inches tall, weighing about one hundred ninety to two hundred pounds. He noted that the suspect was wearing a blue or dark shirt and blue jeans. He described him as having medium-length, dark, messy hair and being between forty and forty-five years old.
 {¶ 6} With the description of the suspect in hand, the police set up a perimeter search in the neighborhood. The police also entered Clarke's home to make sure no one remained inside. The police observed pry marks on the front door and a trail of coins going up the stairs.
 {¶ 7} At 11:45 p.m., John Wiermo ("Wiermo"), another resident of the Wayside Lakes Development, arrived home and noticed that his kitchen curtain rod was on the floor and the screen on the kitchen window was bent out. Having noticed the police in the neighborhood, he approached them and informed them that he thought his home had been burglarized and that he thought some rolled coins were missing.
 {¶ 8} Approximately ten minutes later, a police officer was standing outside Wiermo's home when he observed a man who matched the suspect's description dart out from the woods. The officer shined his flashlight on the man, informed him that he was a police officer and ordered him to stop. The man continued running and the officer informed his colleagues, via radio, of the direction in which the man was running. The suspect was apprehended and arrested a few minutes later. His license identified him as the appellant. He was wearing black jeans and a blue shirt, was about six feet tall, and weighed approximately one hundred ninety-five pounds. Appellant was searched at that time and a pair of brown cotton gloves and $1200 in cash were found on his person.
 {¶ 9} As appellant was being brought to the police car, Clarke saw him and immediately identified him as the man he saw face-to-face following the chase. Clarke stated he was "one hundred percent sure" appellant was that man.
 {¶ 10} During this time, the police were inside Wiermo's home processing the scene. They had found a plastic chair outside the kitchen window with shoe prints on it. The chair was analyzed at the crime lab to compare the prints on the chair with the shoes appellant was wearing when arrested. They were determined to be identical.
 {¶ 11} As Wiermo's home was being processed, a third homeowner, Clyde Chafer ("Chafer"), arrived home and noticed that his home appeared to have been broken into as well. Chafer also noted that he was missing coins from his home.
 {¶ 12} Approximately one week after the incident, Mildred Guernsey ("Guernsey"), who resides in a condominium that is directly next to the Wayside Lakes Development, found several items in her backyard, including a mason jar filled with rolled coins with Wiermo's name and telephone number on them, two class rings from a Cincinnati High School that Clarke attended, with Clarke's name on one of them, and a shower head massager.
 {¶ 13} Approximately two days after that, while visiting her father, Chafer's daughter noted that the showerhead was missing in an upstairs bathroom. She informed Chafer, who subsequently went to the police station and verified that the shower massager found by Guernsey was, in fact, from his home.
 {¶ 14} Appellant had been arrested at the scene on September 26, 1998. A complaint was filed against appellant by the city of Mentor, charging him with possession of criminal tools and burglary. On September 28, 1998, appellant appeared in Mentor Municipal Court and posted bond. Appellant was picked up immediately thereafter by Cuyahoga County on an outstanding warrant, regarding unrelated crimes.
 {¶ 15} On December 14, 1998, appellant was indicted by the Lake County Grand Jury on three counts of burglary and one count of possessing criminal tools. On that same day, a warrant of the indictment was issued to the Lake County Sheriff. A holder was placed upon appellant at that time, as he had charges pending against him in Cuyahoga County and was in jail in lieu of bond awaiting trial on those charges. A nolle prosequi was entered on December 17, 1998, on the Mentor charges.
 {¶ 16} On January 18, 2000, appellant began serving a prison sentence out of Cuyahoga County. On January 24, 2000, the trial court ordered the Lake County Clerk of Courts to issue a warrant to the Lake County Sheriff to convey appellant to Lake County so that he could be arraigned on the above-mentioned charges. On January 26, 2000, appellant was transported to the Lake County jail for an arraignment scheduled for January 28, 2000. At the arraignment, an Assistant Lake County Public Defender attempted to represent appellant for the purpose of arraignment, but appellant refused to be arraigned because his privately retained attorney was not present. Appellant subsequently waived his right to be present at his arraignment on February 11, 2000, and the trial court entered a plea of not guilty on all charges.
 {¶ 17} On March 23, 2000, appellant filed a motion to dismiss based upon speedy trial violations. This motion was denied by the trial court on April 21, 2000.
 {¶ 18} On May 1, 2000, appellant filed a motion to suppress any out-of-court and in-court identifications of him. A hearing was held on the motion on September 8, 2000, and the motion was denied on September 21, 2000.
 {¶ 19} On December 12, 2000, appellant filed a notice of alibi. On January 8, 2001, appellant filed another motion to dismiss based on speedy trial violations. A hearing was held on January 9, 2001, immediately preceding the trial which also commenced on that same date. At the conclusion of the hearing, the court denied the motion and issued a judgment entry on the motion on January 17, 2001.
 {¶ 20} Prior to the trial, the state dismissed the possessing criminal tools charge. At the conclusion of the state's case-in-chief, the defense made a Crim.R. 29 motion for judgment of acquittal, which was denied. At the end of the trial, appellant renewed his Crim.R. 29 motion for acquittal, which was once again denied.
 {¶ 21} On January 11, 2001, the jury returned a guilty verdict against appellant on all three burglary counts. He was sentenced on January 16, 2001, to a total of seven years, to be served consecutively to a sentence appellant was serving out of Cuyahoga County. Appellant subsequently filed this appeal citing five assignments of error.
 {¶ 22} Appellant's first assignment of error is:
 {¶ 23} "The trial court erred to the prejudice of the defendant-appellant when it denied his motion to dismiss for a violation of his statutory and constitutional rights to a speedy trial."
 {¶ 24} Appellant contends that the trial court erred in denying his motion to dismiss for violation of the statutory right to a speedy trial as guaranteed by R.C. 2941.401 and 2945.71.
 {¶ 25} R.C. 2941.401 governs a prisoner's right to make a request for a trial on pending charges and is the controlling statute in this case. It reads, in pertinent part:
 {¶ 26} "When a person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days after he causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter, except that for good cause shown in open court, with the prisoner or his counsel present, the court may grant any necessary or reasonable continuance.***
 {¶ 27} "***
 {¶ 28} "The warden or superintendent having custody of the prisoner shall promptly inform him in writing of the source and contents of any untried indictment, information, or complaint against him, concerning which the warden or superintendent has knowledge, and of his right to make a request for final disposition thereof.
 {¶ 29} "***
 {¶ 30} "If the action is not brought to trial within the time provided, subject to continuance allowed pursuant to this section, no court any longer has jurisdiction thereof, the indictment, information, or complaint is void, and the court shall enter an order dismissing the action with prejudice."
 {¶ 31} Pursuant to R.C. 2941.401, the warden is required to inform the defendant of any pending indictments. If the warden fails to notify the defendant the one hundred eighty-day time limit is not stopped, but, rather, the one hundred eighty-day time limit must be counted as "having commenced upon the first triggering of the state's duty to give notice of the right to make demand for speedy disposition."[1] The state is charged with the duty of acting with "reasonable diligence" in attempting to locate and notify the defendant that charges are pending against him.[2]
 {¶ 32} In the instant case, appellant was not notified by the warden of his right to make a demand for a speedy disposition. Therefore, the one hundred eighty-day time limit commenced upon the first triggering of the state's duty to give appellant notice of the right to make demand for speedy disposition. The Fourth District has held that the state's duty to advise the prisoner of his rights was triggered on the date of arraignment.[3] Thus, in the case sub judice, the state's duty to inform appellant of his right and the commencement of the one hundred eighty-day time limit was on the date of arraignment, or February 11, 2000.
 {¶ 33} Appellant argues, in the second issue under his first assignment of error, that the trial court erred in tolling time for reasons not authorized under R.C. 2941.401. Appellant contends that time is to be tolled under R.C. 2941.401 only in specific instances where a continuance is granted and not for appellant's motions to dismiss or motion to suppress. However, the factors set forth in R.C. 2945.72 for tolling time are applicable to R.C. 2941.401.[4] R.C. 2945.72 reads, in pertinent part:
 {¶ 34} "The time within which an accused must be brought to trial, or, in the case of a felony, to preliminary hearing and trial, may be extended only by the following:
 {¶ 35} "(A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;
 {¶ 36} "***
 {¶ 37} "(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
 {¶ 38} "***
 {¶ 39} "(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"
 {¶ 40} Therefore, when calculating the time from January 26, 2000, the date appellant was formally served with the indictment, through January 8, 2001, the date the trial commenced, time was tolled for both motions to dismiss and the motion to suppress and a total of one hundred seventy-five days are chargeable to the state. Thus, appellant was brought to trial within the one hundred eighty-day time limit.
 {¶ 41} In his third issue under the first assignment of error, appellant argues that the trial court erred in denying his motion to dismiss for lack of a speedy trial in violation of R.C. 2945.71. However, as noted above and within the language of R.C. 2945.71, R.C.2941.401 is the controlling statute in the instant case. R.C. 2945.71(F) reads:
 {¶ 42} "(F) This section shall not be construed to modify in any way section 2941.401 or sections 2963.30 to 2963.35 of the Revised Code."
 {¶ 43} Thus, the proper analysis of whether appellant was deprived of his statutory right to a speedy trial is pursuant to R.C. 2941.401.
 {¶ 44} The calculation of time charged to the state as well as time tolled is as follows:
{¶ 45} Jan 26 — Mar. 22, 2000 charged to state from when appellant was formally served with the indictment until appellant files motion to dismiss. (57 days)
 {¶ 46} "Mar. 23 — Apr. 20, 2000 Time tolled while appellant's motion to dismiss was pending.
{¶ 47} "Apr. 21 — Apr. 30, 2000 Time charged to state after motion to dismiss was denied until appellant files motion to suppress.(10 days)
 {¶ 48} "May 1 — Sep. 20, 2000 Time tolled while appellant's motion to suppress was pending.
{¶ 49} "Sep. 21 — Jan. 9, 2001 Time charged to state after motion to suppress was denied until the commencement of appellant's trial. (108 days)
 {¶ 50} "TOTAL: 175 days"
 {¶ 51} In his final issue presented under his first assignment of error, appellant contends that the trial court erred in denying his motion to dismiss for violation of the right to a speedy trial under the Ohio and United States Constitutions.
 {¶ 52} The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ***."
 {¶ 53} The United States Supreme Court, in Barker v. Wingo, declined to establish the exact number of days within which a trial must be held but declared that, "[t]he states, of course, are free to prescribe a reasonable period consistent with constitutional standards ***."[5]
 {¶ 54} Moreover, the Ohio legislature has enacted the appropriate statutes as a "rational effort to enforce the constitutional right to a public speedy trial,"[6] and the Supreme Court of Ohio has held that they are reasonable and "implement the constitutional guarantee of a public speedy trial."[7]
 {¶ 55} Therefore, appellant's constitutional rights to a speedy trial were protected by the statute and, as already stated, appellant was brought to trial within the one hundred eighty-day time period set forth in R.C. 2941.401.
 {¶ 56} Appellant's first assignment of error is without merit.
 {¶ 57} Appellant's second assignment of error is:
 {¶ 58} "The trial court erred to the prejudice of the defendant-appellant when it denied his motion to suppress."
 {¶ 59} Appellant contends that the trial court erred in denying his motion to suppress the identification testimony by Mr. Clarke when it was unnecessarily suggestive and prejudicial.
 {¶ 60} The United States Supreme Court has set forth a two-tiered process for determining whether in-court and out-of-court identifications are admissible.[8] First, the court must determine whether the identification was unduly suggestive. Second, the court must determine whether there was a substantial likelihood of an irreparable misidentification.[9] The court outlined five factors that must be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the length of time between the crime and the confrontation; and (5) the level of certainty demonstrated by the witness at the time of confrontation.[10]
 {¶ 61} Regarding the first factor, appellant contends that Clarke's ability to view Pesci at the time of the crime was impaired because it was 10:30 p.m. and dark. However, Clarke testified at trial that, although it was night, the area was extremely well lit by streetlights and multiple lights on several homes. Moreover, the face-to-face encounter between Clarke and Pesci enabled Clarke to look at Pesci "right square in the face," further bolstering his ability to identify Pesci.
 {¶ 62} In regards to the second factor, appellant argues that, because Clarke could not identify the object he saw in Pesci's hand, only the color, and because Clarke became frightened of the person during the face-to-face confrontation, his ability to pay adequate attention to the person's appearance was impaired. Appellant also contends that, because Clarke failed to inform the police in his written statement of the face-to-face encounter, it lacks reliability.
 {¶ 63} Although Clarke could not readily identify the object appellant had in his hand, this does not compromise his ability to identify appellant's appearance. Clarke may have been more focused on appellant's appearance than on the object he was carrying. Moreover, although Clarke may have become nervous that appellant may have had a weapon during the face-to-face encounter, this does not automatically impair his ability to pay attention to appellant's appearance and later identify him. In fact, it could possibly have the opposite effect. Lastly, although Clarke failed to include the face-to-face encounter in his written statement, Clarke testified that he did inform the police verbally that he had the encounter with appellant.
 {¶ 64} Appellant also contends that the third factor applies in that Clarke's earlier description of the suspect varied greatly from appellant's actual physical appearance. Specifically, appellant argues that he is twelve years older than the age given by Clarke, he was wearing different colored clothing and Clarke failed to mention any facial stubble in his description.
 {¶ 65} Although Clarke's description of the suspect was not perfect, it certainly lacks the distinct differences asserted by appellant. Clarke testified the suspect had blue jeans and a blue or dark shirt. Appellant was ultimately apprehended wearing black jeans and a blue shirt. He described the suspect as having dark, messy hair, which was accurate. His assessment of appellant's height and weight were equally accurate. The fact that he did not mention facial stubble or gave an inaccurate approximation of appellant's age, does not render his overall description inaccurate or unreliable.
 {¶ 66} Regarding the fourth factor, the time between the crime and the confrontation, appellant argues that, although identification is most reliable when it is obtained only a short time from the actual crime, the opposite is true in this instance. Appellant does not further elaborate on how the fact that Clarke identified appellant just one and a half hours after he saw him running out of Clarke's front door taints the reliability of the identification. Appellant also asserts that, because Clarke was not prompted by the police to make an identification at that time, his identification is unreliable. We do not find either of these assertions to be correct. The fact that Clarke identified appellant so close to the initial crime and did so without any encouragement by the police officers only enhances the reliability of his identification.
 {¶ 67} The final factor relates to the level of certainty of Clarke in his identification. Appellant argues that, although Clarke seemed completely confident in his identification of appellant, this confidence only arose from seeing appellant already arrested in a prejudicial context. We do not agree. Clarke maintained his certainty in the identification from the moment he saw appellant and reiterated that confidence in his initial statement when he said he was "one hundred percent sure" that appellant was the man he chased from his home.
 {¶ 68} An analysis of the five Biggers factors reveals that Clarke's out-of-court and in-court identifications of appellant were not obtained under unduly suggestive circumstances and there was not a substantial likelihood of irreparable misidentification. The trial court did not err in denying appellant's motion to suppress the identifications and appellant's second assignment of error is without merit.
 {¶ 69} Appellant's third assignment of error is:
 {¶ 70} "The trial court erred to the prejudice of the defendant-appellant when it allowed two of the state's witnesses to testify to inadmissible hearsay."
 {¶ 71} Appellant contends that the trial court erred when it permitted two police officers to testify as to the identification of appellant as the testimony was contrary to Evid.R. 801(D)(1) in that the surrounding prior identification did not demonstrate its reliability.
 {¶ 72} Patrolmen Robert Lopez and Michael Orf of the Mentor Police Department both were permitted to testify at trial, over objection, that Clarke approached the officers and appellant and stated, "[i]t's him" and "[t]hat's the man. I am one hundred percent sure."
 {¶ 73} Evid.R. 801(D)(1) governs statements that are not hearsay and reads in pertinent part:
 {¶ 74} "A statement is not hearsay if:
 {¶ 75} "(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is *** (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification."
 {¶ 76} Appellant contends, relying on his argument from his second assignment of error, that Clarke's identification of appellant was inherently unreliable and, as such, the in-court testimony by Officers Lopez and Orf, were inadmissible hearsay in violation of Evid.R. 801(D)(1).
 {¶ 77} As we have already held that Clarke's in-court and out-of-court identifications of appellant were not unreliable and the trial court did not err in denying appellant's motion to suppress, we also hold that the testimony by Lopez and Orf was not inadmissible hearsay, as their testimony was based upon Clarke's reliable identification of appellant soon after perceiving him.
 {¶ 78} Thus, appellant's third assignment of error is without merit.
 {¶ 79} Appellant's fourth assignment of error is:
 {¶ 80} "The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29."
 {¶ 81} Appellant contends that the trial court erred in denying his Crim.R. 29 motion for acquittal. When a defendant files a Crim.R. 29 motion for acquittal, he is challenging the sufficiency of the evidence introduced by the state.[11] The test to be used when evaluating the sufficiency of the evidence is, "whether after viewing the probative evidence and the inference drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt."[12]
 {¶ 82} In other words, on a question of sufficiency, "a reviewing court [should] not reverse a jury verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt."[13]
 {¶ 83} In the instance case, when viewing the evidence presented in a light most favorable to the prosecution, a jury could reasonably conclude that appellant committed the crimes in question.
 {¶ 84} The thrust of appellant's argument is that there was no conclusive evidence linking him to the crimes, other than the identification of him by Clarke, which was inherently unreliable. As we have noted in appellant's second assignment of error, supra, Clarke's identification of appellant at the crime scene was not highly prejudicial or inherently unreliable. Whether Clarke's identification was credible is the province of the trier of fact, as it is the jurors who see the witnesses and observe their demeanor and assign credibility to witness statements.[14]
 {¶ 85} Applying the foregoing standards, we are not persuaded by appellant's argument. There was more than sufficient evidence upon which the jury could reasonably conclude that all of the elements of the offense had been proven beyond a reasonable doubt. Clarke testified that he had chased the suspect from his home and, at one point, he threw his camera at the suspect, who then turned around and met him face-to-face in a fairly well lit area, allowing Clarke to adequately assess his appearance and identity.
 {¶ 86} Appellant's fourth assignment of error is without merit.
 {¶ 87} Appellant's fifth assignment of error is:
 {¶ 88} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 89} Appellant contends that the conviction for three counts of burglary was against the manifest weight of the evidence because the evidence presented by the state did not prove beyond a reasonable doubt that defendant-appellant committed the crimes.
 {¶ 90} In determining whether a verdict is against the manifest weight of the evidence, "the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[15]
 {¶ 91} In State v. Mattison, the Eighth District set forth a number of factors to be considered in determining whether a verdict is against the manifest weight of the evidence.[16] This court has adopted those factors to be used as guidelines when determining a question of manifest weight.[17] Appellant relies on four of these factors, specifically, contradiction of evidence, unproven elements, uncertainty of the evidence, and unreliability of the evidence, in his assertion that the verdict is against the manifest weight.
 {¶ 92} Appellant argues that his alibi evidence contradicted the evidence presented by the state. While appellant did present testimony from both himself and his friend, Mr. Carnsew, asserting that the two were together on the night in question during the time the crimes transpired, this alibi evidence, after a review of the entire record, does not demonstrate that the jury clearly lost its way in reaching a guilty verdict. Both appellant and Carnsew testified that they went out together that night and then proceeded to drive around the area, including inside the housing development where the burglaries took place. Neither was able to accurately account for their whereabouts during the time the crimes were committed but only that they were traveling together, by car, for large portions of the evening. This alibi evidence, while contrary to the state's evidence, does not demonstrate that the verdict was against the manifest weight.
 {¶ 93} Regarding the remaining Mattison factors, appellant also reiterates his argument that, because the identification testimony was unreliable and unduly suggestive, the state failed to prove beyond a reasonable doubt that appellant committed the burglaries and that the evidence itself was uncertain and unreliable. Appellant also cites the fact that no fingerprints were found nor were any stolen items found on his person when arrested to establish that he committed the crimes. As noted prior, the identification of appellant by Clarke at the crime scene was not prejudicial or unduly suggestive. Also, the record reveals that gloves were found near the scene of the crimes, possibly accounting for the lack of fingerprints at any of the crime scenes. Several items belonging to all three homes were found in a backyard near the housing development. Thus, a review of the entire record reveals that the jury did not lose its way or create a manifest miscarriage of justice in reaching its guilty verdict.
 {¶ 94} Appellant's fifth assignment of error is without merit.
 {¶ 95} Appellant's assignments of error are without merit and the judgment of the trial court is affirmed.
JUDITH A. CHRISTLEY and ROBERT A. NADER, JJ., concur.
[1] State v. Fitch (1987), 37 Ohio App.3d 159, 162.
[2] State v. Martin (1984), 16 Ohio App.3d 172, 173.
[3] See State v. Nero (Apr. 4, 1990), 4th Dist. No. 1392, 1990 Ohio App. LEXIS 1383, at *4; State v. Curry (Sept. 30, 1997), 4th Dist. No. 95CA2339, 1997 Ohio App. LEXIS 4495, at *10, fn. 9.
[4] Nero, at *5, fn. 1.
[5] Barker v. Wingo (1972), 407 U.S. 514, 523.
[6] State v. Pachay (1980), 64 Ohio St.2d 218, syllabus.
[7] Id. at 221.
[8] Neil v. Biggers (1972), 409 U.S. 188, 198.
[9] Id.
[10] Id. at 199-200.
[11] State v. Mauri (June 26, 1998), 11th Dist. No. 97-A-0045, 1998 WL 553158, at *2.
[12] (Citations omitted.) State v. Davis (1988), 49 Ohio App.3d 109,113.
[13] State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[14] State v. Mills (1992), 62 Ohio St.3d 357, 368, quoting State v.Petro (1947), 148 Ohio St. 473, 501.
[15] (Citations omitted.) Davis, 49 Ohio App.3d at 113.
[16] State v. Mattison (1985), 23 Ohio App.3d 10.
[17] State v. Harris (Apr.10, 1998), 11th Dist. No. 96-T-5512, 1998 Ohio App. LEXIS 1540.